Grafton
No. 99-749

DAVID S. VAUTOUR *& a.*

v.

BODY MASTERS SPORTS INDUSTRIES, INC.

November 5, 2001

*Coolidge, Mathieu, Barrington, Berube & Couture*, of Somersworth (*Gregory R. Couture* on the brief and orally), and *Robert K. Mekeel, P.A.*, of Concord (*Mr. Mekeel* on the brief), for the plaintiffs.

*Downs Rachlin & Martin, PLLC*, of Littleton (*Gregory S. Clayton* and *Gregory M. Eaton* on the brief, and *Mr. Eaton* orally), for the defendant.

DUGGAN, J. The plaintiffs in this products liability action, David S. Vautour and Susan Vautour, appeal an order of the Superior Court (*Fitzgerald*, J.) granting a motion for directed verdict to the defendant, Body Masters Sports Industries, Inc. We reverse and remand.

Mr. Vautour was injured while using a leg press machine manufactured by the defendant. The leg press is designed to strengthen a weightlifter's leg muscles by allowing him or her to raise and lower a metal sled, which may be loaded with weights, along fixed carriage tracks. A manually engaged safety system allows weightlifters to adjust safety stops and to operate the machine while sitting in a fixed, inclined position. In this position, a weightlifter may perform either deep leg presses or calf raise exercises. With legs extended along the carriage track and the balls of the weightlifter's feet on the sled, a weightlifter performs calf raise exercises by rotating the ankles up and down so that the sled and weights move up and down.

The leg press has two sets of safety stops, the upper and the lower stops. The upper stops provide a place for the weightlifter to rest the weight after extending his or her legs and pushing up the sled. The lower stops prevent the sled and weights from landing in the weightlifter's lap if

he or she loses control of the machine. When the upper stops of the machine are disengaged the lower stops are engaged. The warning label on the machine states, "Caution. Handles must be in locked position when doing calf exercises," thereby instructing weightlifters to engage the upper stops when performing calf raises.

Mr. Vautour's injury occurred while moving his feet down to do calf raises. Although he was aware of the machine's warning label, Mr. Vautour did not have the upper stops engaged at the time of his accident. As a result, the sled and his knees fell rapidly toward his chest, injuring his feet. Mr. Vautour brought suit against the defendant under the theories of strict liability, negligence, and breach of warranty. Mr. Vautour contends that the location of the safety stops "exposed users to an unreasonable risk of harm and that this design defect" caused his injuries.

At trial, Barry Bates, the plaintiffs' biomechanics expert, testified that the machine, as designed, is hazardous because it does not adapt well to a wide range of body sizes and weightlifters may perform calf raise exercises without the upper stops engaged. He testified that in his opinion the leg press was defective and dangerous to weightlifters "because of the location of the lower stops and the possibility that the weight carriage can drop onto the person, putting them beyond their normal performance range of motion." Bates proposed that the leg press should be designed with adjustable, rather than fixed stops. He testified that he had not designed a machine with adjustable stops and did not know of any manufacturer in the industry who made a machine using adjustable stops. He testified, however, that by using adjustable stops "anything that was used would be better" than the fixed stops to prevent injuries. Under cross-examination, Bates admitted that the adjustable stops would not reduce the risk of injury to a user if he or she failed to manually set the stops before operating the machine.

After the close of the plaintiffs' case in chief, the defendant moved for a directed verdict, or, in the alternative, for dismissal, on the ground that the plaintiffs had failed to introduce evidence sufficient to make out a *prima facie* case. After the plaintiffs withdrew their claim for breach of warranty, the superior court granted the defendant's motion for directed verdict on the strict liability and negligence claims, concluding that:

> The point at which safety stops could be placed along the sled carriage without interfering with the muscle-strengthening function of the machine, the point at which stops must be placed to ensure that users are reasonably safe from physical injury, and the degree of risk to which users might reasonably be exposed when engaging in such leg strengthening exercises are

each factual questions which appear, by their nature, to require specialized knowledge in the areas of design engineering, physiognomy, bio-mechanics, and safety standards in the field of athletic training.

Because the average juror could not be expected to know about these topics and because the plaintiffs' expert failed to offer any testimony regarding the acceptable risk of injury, where the safety stops should be located, or how his proposed alternative design would prevent the type of injuries suffered by Mr. Vautour, the superior court concluded that the plaintiffs failed to introduce evidence sufficient to support their strict liability and negligence claims.

On appeal, the plaintiffs assert that they proved all of the essential elements of their strict liability claim and the superior court erred by requiring them to prove an alternative design as an additional element in the case.

"A trial court may grant a directed verdict only when the evidence and all reasonable inferences therefrom, construed most favorably to the party opposing the motion, would not enable a jury to find for that party." *Laramie v. Sears, Roebuck & Co.*, 142 N.H. 653, 656 (1998) (quotation omitted). "In conducting its analysis of the evidence, the trial court should not assess the weight to be given to testimony; rather, questions of weight are properly left to the jury." *Blais v. Remillard*, 138 N.H. 608, 611 (1994). The plaintiff may not avoid a directed verdict, however, by presenting evidence that is merely conjectural in nature. *Id.* Rather, the plaintiff must present sufficient evidence to satisfy the burden of proof such that a reasonable jury could find in her favor. *Id.* "If the evidence adduced at trial is conflicting, or if several reasonable inferences may be drawn, the motion should be denied." *Thomas v. Finger*, 144 N.H. 500, 502 (1999) (quotation omitted); *LeBlanc v. American Honda Motor Co.*, 141 N.H. 579, 585 (1997) (applying same standard to motion for judgment notwithstanding verdict in strict liability, defective design claim). Our standard of review on this issue is whether the trial court abused its discretion. *See Thomas*, 144 N.H. at 502.

■ ■ A product is defectively designed when it "is manufactured in conformity with the intended design but the design itself poses unreasonable dangers to consumers." *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 807 (1978). To prevail on a defective design products liability claim, a plaintiff must prove the following four elements: (1) the design of the product created a defective condition unreasonably dangerous to the user; (2) the condition existed when the product was sold by a seller in the

business of selling such products; (3) the use of the product was reasonably foreseeable by the manufacturer; and (4) the condition caused injury to the user or the user's property. *Chellman v. Saab-Scania AB*, 138 N.H. 73, 77 (1993).

■ To determine whether a product is unreasonably dangerous, we explained in *Bellotte v. Zayre Corp.*, 116 N.H. 52, 54 (1976), that a product "must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.* In *Price v. BIC Corp.*, 142 N.H. 386, 389 (1997), we further explained that whether a product is unreasonably dangerous to an extent beyond that which would be contemplated by the ordinary consumer is determined by the jury using a risk-utility balancing test.

■ Under a risk-utility approach, a product is defective as designed "if the magnitude of the danger outweighs the utility of the product." W. KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 99, at 699 (5th ed. 1984). We have articulated the risk-utility test as requiring a "multifaceted balancing process involving evaluation of many conflicting factors." *Thibault*, 118 N.H. at 809. In order to determine whether the risks outweigh the benefits of the product design, a jury must evaluate many possible factors including the usefulness and desirability of the product to the public as a whole, whether the risk of danger could have been reduced without significantly affecting either the product's effectiveness or manufacturing cost, and the presence and efficacy of a warning to avoid an unreasonable risk of harm from hidden dangers or from foreseeable uses. *See Price*, 142 N.H. at 389. "Reasonableness, forseeability, utility, and similar factors are questions of fact for the jury." *Thibault*, 118 N.H. at 809.

The defendant contends that the risk-utility test, as articulated in *Thibault*, implicitly requires a plaintiff to offer evidence of a reasonable alternative design. Because the jury is instructed to consider whether the risk of danger could have been reduced without significantly affecting the effectiveness of the product and the cost of manufacturing, the defendant contends that evidence of a reasonable alternative design is required. The defendant urges us to adopt the RESTATEMENT (THIRD) OF TORTS § 2(b) (1998), which requires a plaintiff in a design defect case to prove that the risks of harm posed by the product could have been reduced or avoided by a reasonable alternative design. RESTATEMENT (THIRD) OF TORTS § 2(b) provides that:

[A product] . . . is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

By requiring a plaintiff to present evidence of a safer alternative design, section 2(b) of the RESTATEMENT thus elevates the availability of a reasonable alternative design from merely "a factor to be considered in the risk-utility analysis to a requisite element of a cause of action for defective design." *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 256 (Tex. 1999).

There has been considerable controversy surrounding the adoption of RESTATEMENT (THIRD) OF TORTS § 2(b). *See, e.g.*, Note, *Just What You'd Expect: Professor Henderson's Redesign of Products Liability*, 111 HARV. L. REV. 2366 (1998); Lavelle, *Crashing Into Proof of A Reasonable Alternative Design: The Fallacy of The Restatement (Third) of Torts: Products Liability*, 38 DUQ. L. REV. 1059 (2000); Schwartz, *The Restatement, Third, Tort: Products Liability: A Model of Fairness and Balance*, 10 KAN. J.L. & PUB. POL'Y 41 (2000); Vandall, *The Restatement (Third) of Torts: Products Liability Section 2(B): The Reasonable Alternative Design Requirement*, 61 TENN. L. REV. 1407 (1994). Most of the controversy stems from the concern that a reasonable alternative design requirement would impose an undue burden on plaintiffs because it places a "potentially insurmountable stumbling block in the way of those injured by badly designed products." *Just What You'd Expect: Professor Henderson's Redesign of Products Liability*, *supra* at 2373 (quotation omitted). Commentators have noted that for suits against manufacturers who produce highly complex products, the reasonable alternative design requirement will deter the complainant from filing suit because of the enormous costs involved in obtaining expert testimony. *See id.* Thus, because of the increased costs to plaintiffs of bringing actions based on defective product design, commentators fear that an alternative design requirement presents the possibility that substantial litigation expenses may effectively eliminate recourse, especially in cases in which the plaintiff has suffered little damage. *See id.*; *see also* Vandall, *supra* at 1425-26.

On a practical level, the RESTATEMENT'S requirement of proof of an alternative design may be difficult for courts and juries to apply. To determine whether the manufacturer is liable for a design defect, the jury must currently decide whether the plaintiff has proven the four essential elements of a design defect case. *See LeBlanc v. American Honda Motor Co.*, 141 N.H. 579, 585 (1997). As part of this analysis, the jury must

determine whether the design of the product created a defective condition unreasonably dangerous to the user. In order to prove this element under the RESTATEMENT, a plaintiff must meet the requirement of proving the "availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm." RESTATEMENT (THIRD) OF TORTS § 2 comment *f* at 24 (1998). The RESTATEMENT, however, contains far-reaching exceptions. According to the RESTATEMENT, the reasonable alternative design requirement does not apply when the product design is "manifestly unreasonable." *Id.* comment *e* at 21-22. Plaintiffs are additionally not required to produce expert testimony in cases in which the feasibility of a reasonable alternative design is obvious and understandable to laypersons. *See id.* comment *f* at 23; *see also, e.g., Pietrone v. American Honda Motor Co., Inc.*, 235 Cal. Rptr. 137, 139 (Ct. App. 1987). Consequently, a requirement of proving a reasonable alternative design coupled with these broad exceptions will introduce even more complex issues for judges and juries to unravel.

■ ■ A more important consideration is that while proof of an alternative design is relevant in a design defect case, it should be neither a controlling factor nor an essential element that must be proved in every case. As articulated in *Thibault*, the risk-utility test requires a jury to consider a number of factors when deciding whether a product is unreasonably dangerous. *See Thibault*, 118 N.H. at 807. This list is not meant to be exclusive, but merely illustrative. "Depending on the circumstances of each case, flexibility is necessary to decide which factors" may be relevant. *Armentrout v. FMC Corp.*, 842 P.2d 175, 184 (Colo. 1992) (explaining in dictum that relevant factors cannot be confined to a single list which must always be applied regardless of circumstances). Thus, the rigid prerequisite of a reasonable alternative design places too much emphasis on one of many possible factors that could potentially affect the risk-utility analysis. *See Bodymasters v. Wimberley*, 501 S.E.2d 556, 559 (Ga. Ct. App. 1998) (explaining that a risk-utility test requires the balancing of several factors, and no one factor alone is a prerequisite for bringing a claim). We are therefore satisfied that the risk-utility test as currently applied protects the interests of both consumers and manufacturers in design defect cases, and we decline to adopt section 2(b) of the RESTATEMENT.

The defendant argues that even if we do not adopt the reasonable alternative design requirement, the superior court's decision should still be affirmed because the plaintiffs chose to proceed on that theory. The defendant argues that by electing to proceed *solely* on the theory that the

leg press was unreasonably dangerous because of the improper design of the sled and handles, the plaintiffs had an obligation to present sufficient evidence on the feasibility of a safer, alternative design. We disagree. The plaintiffs' burden was to present evidence regarding the risk-utility factors; they did not have the duty of proving a safer, alternative design.

■ ■ Here, the plaintiffs presented sufficient evidence that the leg press machine was unreasonably dangerous pursuant to the risk-utility balancing test. The plaintiffs' expert testified that the defendant's design was "dangerous to the user, from an injury perspective," and his proposed design was safer than the defendant's current design. Although he did not specify exactly where the safety stops should have been placed to prevent Mr. Vautour's injuries, he did testify that his design was mechanically feasible and, under similar circumstances, machines with such a design would be, overall, less dangerous. It was up to the jury to assess the weight to be given this testimony. *See Blais,* 138 N.H. at 611. "Weighing of substantive evidence is the very essence of the jury's function. Consequently the trial judge has been granted little discretion to withdraw questions of substantive fact from a jury's consideration." *Lane v. Ackley,* 120 N.H. 127, 128 (1980) (quotation omitted). While certainly a reasonable jury could have found this evidence insufficient to establish that the leg press design was unreasonably dangerous, we cannot say that no reasonable jury could have found otherwise. Nor can we say, when viewing the evidence in the light most favorable to the plaintiffs, that the sole reasonable inference from this testimony is so overwhelmingly in favor of the defendant that no contrary verdict could stand *See LeBlanc,* 141 N.H. at 587. Thus, we hold that the trial court erroneously granted the defendant's motion for directed verdict upon the plaintiffs' strict liability, design defect claim. Under New Hampshire law, the plaintiffs' evidence was sufficient to establish a *prima facie* case.

Finally we note that because the plaintiffs did not appeal the trial court's decision to dismiss their negligence claim, they have waived that issue. *See State v. Mountjoy,* 142 N.H. 648, 653 (1998).

*Reversed and remanded.*

BROCK, C.J., and BRODERICK, J., sat for oral argument but did not take part in the final vote; NADEAU and DALIANIS, JJ., concurred.